Justin BULT, Petitioner and Appellant,

v.

Walter LEAPLEY, Warden of the South Dakota State Penitentiary, Appellee.

No. 17914.

Supreme Court of South Dakota.

Considered on Briefs on January 14, 1993.

Decided Oct. 20, 1993.

Rehearing Denied Nov. 30, 1993.

Michael J. Butler of Butler and Nesson, Sioux Falls, for appellant.

Mark Barnett, Atty. Gen., Mark Smith, Asst. Atty. Gen., Pierre, for appellee.

MILLER, Chief Justice.

## ACTION

A jury convicted Justin Lloyd Bult (Bult) of kidnapping, SDCL 22–19–1, and sexual contact with a child under fifteen, SDCL 22–22–7. He was sentenced to life imprisonment on the kidnapping conviction and to a concurrent ten year sentence on the sexual contact conviction by Circuit Court Judge Eugene L. Martin. This Court unanimously affirmed Bult's convictions; no issues regarding the sentence were raised on direct appeal. *State v. Bult,* 351 N.W.2d 731 (S.D. 1984). Bult filed an application for a writ of habeas corpus contending that his life sentence without the possibility of parole was constitutionally offensive under state and federal constitutional provisions prohibiting the imposition of cruel and unusual punishment. Circuit Court Judge Jon R. Erickson entered findings of fact, conclusions of law, and judgment denying the application for a writ of habeas corpus. Because we conclude that the sentence shocks the conscience, we reverse and remand for resentencing proceedings.

## FACTS OF THE OFFENSE

Bult does not dispute the factual allegations and evidence which supported them and led to his conviction. We summarize the facts of the offense from our statement of facts in *State v. Bult, supra.*

Over eleven years ago at 5:10 p.m. on September 15, 1982, Bult, an eighteen year old high school senior, forced a screaming and crying five-year-old girl off of her tricycle and into his automobile. He drove away at a high rate of speed. According to the victim, they drove to a corn field in the

country where he held her down, removed her clothes, and "tried to put his wienie" in her while she was laying on the seat. At 5:35 p.m. that afternoon the victim's mother heard her daughter screaming in the yard and questioned her about what had happened.

Bult initially denied being implicated but later admitted to investigators that he abducted the victim and attempted to have sex with her. He refused to sign a written confession. At trial, Bult testified, denied all charges, and presented alibi witnesses. The jury reached guilty verdicts.

## SENTENCING

At sentencing the trial court had the benefit of a presentence report. According to the report, Bult was born on January 19, 1964. He was raised by his natural parents and felt that he had a good childhood except for the times that his parents were drunk.

Bult's criminal record involved an incident of alleged arson in 1975. He was adjudicated delinquent on October 16, 1975, and placed on indefinite probation which terminated on December 3, 1975. On September 14, 1981, Bult was placed on a ninety day diversion program because of a referral as a child in need of supervision alleging that he was a runaway and beyond parental control. This terminated on November 30, 1981.

Educationally, Bult was in the twelfth grade. Academically he was a poor student, a problem exacerbated by his short temper. Despite his low academic ability, he never missed a day and was never tardy for three years. With individualized educational instruction he showed considerable improvement in the area of self-concept although his social skills had not developed as dramatically.

At sentencing the state urged the trial court to impose a substantial sentence but did not ask that Bult be sentenced to life imprisonment due to his age and lack of previous felony convictions.[1] The state told the trial court, in part:

And the State is not going to ask that Mr. Bult be imprisoned for life. I think be-

cause of his age and his lack of previous felony convictions, in good conscience and fair [sic] to the Defendant, I don't believe we can ask for it and we do not ask for it.

Bult's attorney believed that a long penitentiary sentence would serve little purpose and urged remedial treatment.

The trial court addressed Bult and said, in part, that it was sentencing him to life imprisonment because:

The crimes that the Jury has found you guilty of are very serious and ones which generate very little if any compassion by anybody. I think that one must make an effort to balance your particular interests against the interests of the public and that is not an easy thing to do. And this is not an easy thing for me to do. But I have done some reading about the type of crimes that are of the nature that the Jury says you committed and the ability of some people to treat the individual who has committed those crimes. The problem that you keep running into is the chance of those crimes repeating themselves by virtue of the personality or whatever of the person who committed the crimes. And I thought about this matter a great deal and the things [sic] that concerns me most is the chance of repeating and the fact that I don't feel that society should have to suffer the risk of this offense repeating itself again.

## HABEAS CORPUS

In his application for a writ of habeas corpus Bult contended that the life sentence without the possibility of parole infringed upon his constitutional right to be free from cruel and unusual punishment. In addition, Bult presented the court with information regarding the sentences of inmates imprisoned in the South Dakota penitentiary for kidnapping.

The habeas court concluded that while Bult's sentence was severe, it was not, in light of all the facts, so excessive or cruel as to meet the disapproval and condemnation of the conscience and reason of men generally or of the court. It concluded that the sen-

1. We note the state offered a twenty year plea bargain which Bult declined.

tencing court's concern for the risk of Bult repeating the offense was confirmed by the 1990 South Dakota Governor's Task Force on Children's Justice Report which said that while youthful sex offenders may be treated to the point that they no longer pose a threat to society, the state penal facilities have inadequate evaluation and treatment programs resulting in the unsupervised release of perpetrators who are at risk to reoffend. The court also concluded that the Eighth Amendment to the United States Constitution and Article VI § 23 of South Dakota's Constitution encompass a narrow proportionality principle.

## ISSUE

■ WHETHER BULT'S SENTENCE OF LIFE WITHOUT THE POSSIBILITY OF PAROLE VIOLATES STATE AND FEDERAL PROHIBITIONS AGAINST CRUEL AND UNUSUAL PUNISHMENT?

"On appeal, we first determine whether the sentence 'shocks the conscience' or is so disproportionate to the crime that it activates the Eighth Amendment 'within and without jurisdiction' proportionality tests." *State v. Lykken*, 484 N.W.2d 869, 879 (S.D.1992); *State v. Basker*, 468 N.W.2d 413, 418 (S.D.1991). *Accord State v. Andrews*, 393 N.W.2d 76, 82–83 (S.D. 1986); [*State v. Weiker*] *Weiker II*, 366 N.W.2d [823] at 827 (S.D.1985). "Absent a sentence which is so excessive in duration that it shocks the conscience of the court, it is well settled in South Dakota that a sentence within statutory limits is not reviewable on appeal." *Lykken*, 484 N.W.2d at 879; *State v. Janssen*, 371 N.W.2d 353, 356 (S.D.1985) (citing cases). Stated alternatively, we will only engage in extensive review of a sentence where we have first determined the sentence was manifestly disproportionate to the crime. *State v. Holloway*, 482 N.W.2d 306, 310–311 (S.D. 1992); *Weiker II*, 366 N.W.2d at 827. "If a sentence is manifestly disproportionate to the crime, [in light of the gravity of the offense and harshness of the penalty] . . . then the other two factors listed in *Helm* [sentence imposed on others in the same jurisdiction and in other jurisdictions] become more focused and require extensive

review." *Weiker II*, 366 N.W.2d at 827. *See also Helm*, 463 U.S. at 292, 103 S.Ct. at 3011, 77 L.Ed.2d at 650.

*State v. Castaneira*, 502 N.W.2d 112, 114–115 (S.D.1993) *quoting*, *State v. Gehrke*, 491 N.W.2d 421, 423 (S.D.1992).

The test to determine whether a sentence is so constitutionally offensive as to shock the conscience is two-fold. *State v. Shilvock–Havird*, 472 N.W.2d 773 (S.D.1991).

First, is the punishment so excessive or so cruel "as to meet the disapproval and condemnation of the conscience and reason of men generally." And second, whether the punishment is so excessive or so cruel as to shock the collective conscience of this court.

*Id.*, 472 N.W.2d at 779.

■ The commonly accepted goals of punishment are 1) retribution, 2) deterrence, both individual and general, and 3) rehabilitation. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). We have recognized that while a life sentence without parole extracts retribution, deters the convict from committing crime, removes him from the street, and puts would-be felons on notice of the high penalty of recidivism, it completely eschews the goal of rehabilitation. *State v. Weiker*, 342 N.W.2d 7 (S.D.1983).

In *Weiker, supra*, we noted that a life sentence is exceeded in severity only by capital punishment. While we acknowledged that there are cases where the imposition of a life sentence without parole is meritorious, we cautioned:

[T]hey are rare and should involve a history of much more serious offenses that by reason of their brutality or calculated destructiveness render irrelevant the goal of rehabilitation and require in vindication of public safety and the moral underpinnings of the criminal law that the offender forfeit his right to ever again be set free.

\*  \*  \*  \*  \*  \*

But even more strongly, we recommend to the trial court that the maximum of life sentence be imposed only in such cases where it can determine from the facts of the principal offense and the previous con-

victions that rehabilitation is so unlikely as to be removed from consideration in sentencing; that the interests of society demand that the convict be kept off the streets for the rest of his life; and that society, speaking through the legislature, has clearly mandated that the offense or offenses involved are so malignant that a lifetime of incarceration is the only adequate retribution.

*Weiker, supra*, 342 N.W.2d at 12.

Bult was convicted of kidnapping, a Class 1 felony, and sexual contact with a child under fifteen, a Class 4 felony. The South Dakota Legislature gave trial courts broad discretion in determining the severity of the sentence that a defendant convicted of each crime receives. Neither crime carries a statutory minimum penitentiary sentence. The maximum penitentiary sentence for Class 1 kidnapping was life imprisonment without the possibility of parole while the maximum sentence for Class 4 sexual contact was ten years imprisonment. SDCL 22–22–7, 22–19–1, 22–6–1. The trial court sentenced Bult to the maximum penitentiary sentence for each conviction. It is apparent from its remarks at Bult's sentencing that the trial court believed that any person committing the crimes Bult was convicted of was beyond rehabilitation.

We do not minimize or trivialize the seriousness of Bult's abduction and attempted rape of a five-year-old girl. However, this crime, although brutal and destructive, does not rise to a level rendering rehabilitation irrelevant. Bult did return the child to her home shortly after the abduction. Fortunately, the victim was not raped, nor did she sustain substantial physical injury.

In addition, the record reveals that at the time of the offense the eighteen year old Bult's criminal history consisted of two brushes with the law while he was a juvenile and resulted in a brief period of probation and a ninety day diversion program. While he had learning disabilities and self-image problems one-on-one counseling resulted in positive changes, a fact reflecting amenability to rehabilitation. In addition, there was no evidence of any prior sexual offenses or sexual disfunctionality which would lead to the conclusion that Bult was an incorrigible criminal incapable of rehabilitation.

In sentencing Bult to life imprisonment without the possibility of parole for kidnapping the trial court went beyond the facts of the case, the information contained in the presentence report, and the prosecutor's recommendation. Based upon this record, a life sentence without the possibility of parole for this eighteen year old defendant shocks the conscience of men generally and of this Court.

Finally Bult presented the habeas corpus court with all available information concerning individuals serving time in the penitentiary for a conviction of kidnapping. Because of our conclusion that Bult's sentence shocks the conscience, the need to determine whether the sentence is so disproportionate to the crime as to activate Eighth Amendment proportionality review is obviated.[2] We only observe that this data validates our judgment that a life sentence in Bult's case shocks the conscience. Bult's case is distinguished from the cases presented where life terms for kidnapping were imposed by Bult's youth, his lack of significant prior convictions, and the fact that he did not inflict substantial bodily injury or use a deadly weapon.

Reversed and remanded for resentencing proceedings.

WUEST, SABERS, and AMUNDSON, JJ., concur.

HENDERSON, J., concurs specially.

HENDERSON, Justice (specially concurring).

Based upon this Court's decision, a hearing before the appropriate trial court, which would amount to a resentencing hearing, should now be held. Due process must attend with the petitioner being given a full opportunity to prove his rehabilitative worth. This hearing must be granted in a meaning-

---

**2.** Whether the Eighth Amendment even encompasses a proportionality principle in non-capital cases has been called into question by the United States Supreme Court. *Harmelin v. Michigan*, 501 U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991).

ful manner. *Daugaard v. Baltic Co-op. Bldg. Supply Ass'n,* 349 N.W.2d 419, 424 (S.D. 1984) (quoting *Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113, 119 (1971)).

These offenses took place in Huron, South Dakota, which is the county seat of Beadle County. Both Judge Martin, the sentencing judge, and Judge Erickson, the habeas judge who denied habeas corpus relief, chamber in the Beadle County Courthouse. It is beyond cavil to note that this was a sensational episode in the community of Huron, spawning strong feelings and high emotion. Truly, this is understandable. For, indeed, a 5 year-old girl was abducted from her tricycle and taken to a cornfield where an 18 year-old high school senior had sexual contact upon her little body. Thirty minutes later she was returned to her neighborhood. Although no evidence of penetration was found, the testifying physician noted scratches and marks on her neck, thigh, and chest. Additionally, the little girl's genitalia area was red and somewhat swollen. By any norm within civilized society, it was a dastardly act.

This criminal scenario took place on September 15, 1982; on June 3, 1983, petitioner was sentenced to life imprisonment without parole on a kidnapping conviction and to a concurrent ten-year sentence on a sexual contact conviction. As of the time I write, petitioner has been in the State Penitentiary for a period of ten years. So far as the court system is concerned, until this Habeas Corpus action was filed, heard, and appealed, petitioner has been under the sole jurisdiction of the executive branch of government, and, most particularly, the rules and regulation of the State Penitentiary and the executive branch of government.

So—ten years have gone by and troubling questions pervade my spirit. What has he learned? What has he been taught in the state penitentiary? His spirit—is it now contrite? What kind of value system does he have? And during these ten years, what of the little girl? She is now in her teens. What of her memories? And her fears? Has she required psychological treatment? And the petitioner—has he undergone psy-

chiatric treatment? These questions must be probed for answers so that the resentencing court is knowledgeable about petitioner's mind and conduct. Judge Erickson is a former Assistant Attorney General. He served for years on the Board of Pardons and Paroles. These were years of dedication and able effort. As a circuit court judge, and the habeas court herein, he found in Finding of Fact # 14 that South Dakota's "state penal facilities have inadequate evaluation and treatment programs, which results in perpetrators who are still at risk to re-offend being released, often without supervision." Obviously, inter alia, this weighed heavily in his decision in concluding that petitioner should be denied relief. In so finding, Judge Erickson took judicial note of the Governor's Task Force on the Children's Justice Report.

The preceding dissertation leads me to SDCL 22–22–1.3 which calls for *extra information* on a sex offender. This new law, enacted by our State Legislature in 1992, took effect on July 1, 1992. Said law provides as follows:

> Any person convicted of a violation listed in § 22–22–1.2 * shall have included in his presentence investigation report an assessment which shall include the following information: the offender's sexual history; intellectual, adaptive and academic functioning; social and emotional functioning; previous legal history; previous treatment history; victim selection; risk to the community; and treatment options recommended.

In my opinion, it is evident that the resentencing judge, whomsoever he or she may be, *must* consider the above criteria. Implicit in the consideration would be the penitentiary record of petitioner. If there are mitigating circumstances that should *now* be considered, pursuant to SDCL 22–22–1.4, with respect to the sexual offense, the trial court should enter its factual basis in writing. A *new sentence* will now be entered pursuant to the majority opinion; a sentence to life imprisonment, without parole, the majority holds, "shocks the conscience of men generally and of this Court."

---

* This refers to minimum sentences for sexual contact with children under ten years of age.

I would further venture that a *new sentencing trial judge* should now hear this case. *See United States v. Robin,* 553 F.2d 8, 11 (2nd Cir.1977) wherein it advised that "... reassignment to another judge may be advisable in order to avoid 'an exercise in futility [in which] the Court is merely marching up the hill only to march right down again', *United States v. Tucker,* 404 U.S. 443, 452, 92 S.Ct. 589, 594, 30 L.Ed.2d 592, 599 (1972) (Blackmun, J., dissenting)." A fresh approach to the resentencing process could well produce a desirable objectivity. Note the final words in SDCL 22–22–1.3: "... and treatment options recommended."

As I write, I wonder—who determines what those "treatment options" are? A Court Services Officer? A psychologist? A psychiatrist? After ten years of incarceration, one would believe that a mental profile of the petitioner is indispensable to a sound sentence. And that, I believe, would be an expert, appointed by the trial court, to look into this 28 year-old man's mind. He is no longer a teenager. In this connection, I refer to 1 Corinthians 13:11: "When I was a child, I talked like a child, I thought like a child, I reasoned like a child. When I became a man, I put childish ways behind me." It is unknown, at least to the judiciary, the effect ten years of imprisonment has had upon the petitioner.

Underlying the resentencing process should be, as reflected upon in *State v. Weiker,* 342 N.W.2d 7, 11 (S.D.1983) (*Weiker I*): (1) Retribution (2) Deterrence and (3) Rehabilitation. These criteria were adopted by this Court from *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). A considered judgment (sentence) should consider the victim and determination should be made if restitution is applicable for counseling; at first blush, with years (possibly) to serve in prison, such a judgment could ring hollow for, indeed, where would petitioner obtain money to pay for counseling? An evidentiary hearing would, as an example of enlightenment, reveal if there has been counseling and expense for treatment of the victim to the date of sentencing. The State of South Dakota should have an opportunity, also, to bring out a rebuttal, if it so sees fit,

to any mitigation produced by petitioner. A state victim's assistance office and court services officer would be a great aid to the sentencing judge to arrive at a plausible legal conclusion. Under the dictate of *State v. Wolff,* 438 N.W.2d 199 (S.D.1989), a restitutional hearing must be held with due process requirements fulfilled. In *State v. Reed,* 451 N.W.2d 409, 411 (S.D.1990), this Court upheld a sentence ordering mental health treatment. In *Reed* at 411 we expressed:

> While the sentence serves the valid goals of retribution and deterrence the trial court also provided for the goal of rehabilitation by ordering mental health treatment.

In *Reed,* the record revealed that he had a history of being sexually abused as a child and later sexually abused small children.

Vindictiveness has no place in resentencing. *See Alabama v. Smith,* 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1988). When a case, such as this one, ends up with a reversal, a trial judge should reassess the original sentence, using objective criteria to arrive at a just sentence. Earlier this year, this Court affirmed a 40–year probation sentence for a 17 year-old lad who held his classmates in terror in one of the biggest high schools in South Dakota, Stevens High School in Rapid City. *See State v. Harris,* 494 N.W.2d 619 (S.D.1993). Harris was found guilty of one count of kidnapping, one count of intentional damage to property (shooting up a classroom with classmates therein), and three counts of aggravated assault. I point this case out to illustrate the disparity of sentencing. In *Harris,* I concurred on affirming on the merits of the case but dissented to the 40–year probation, believing that it was an illegal sentence, citing *State v. Oban,* 372 N.W.2d 125 (S.D.1985) and *State v. Tibbets,* 333 N.W.2d 440 (S.D. 1983). *In Matter of A.S.,* 496 N.W.2d 589, 590 (S.D.1993), in concurring, I expressed that appellate courts exist for a reason and thereupon, cited to Parker, *Improving Appellate Methods,* 25 N.Y.U.L.Rev. 1 (1950), which set forth three basic functions of appellate courts. The second basic function being "to see that justice is administered uniformly throughout the state."

In SDCL 24–1–1, it is specified that the State Penitentiary exists for the punishment of offenders and their reformation. As I pointed out in *State v. Holloway*, 482 N.W.2d 306, 314 (S.D.1992) in my special writing, the penitentiary's name is taken from the word "penitent." To be penitent is having a feeling or expressing pain for sins or offenses. It is to be sincerely affected by a sense of guilt and to be resolved on the worthy concept of amending one's life. Petitioner is a first offender.

In the reports to the sentencing judge, there was some denial on the part of the petitioner of his guilt, with certain expressions by him that there was not enough evidence offered to the jury to prove him guilty. He also told H.T. Hermann, M.D., psychiatrist, that he agreed to the accusations against him to law enforcement only "to get them off my back" and that in truth, and in fact, he had absolutely no contact with the little girl at all. This interview took place some 10 years ago. Is he now penitent? Has he abandoned denial? Has he reformed himself? All of these haunting questions must be determined by the resentencing judge. I recently came across this case, *United States v. Jones*, 965 F.2d 1507, 1521 (8th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 346, 121 L.Ed.2d 261 (1992):

> However, punishing first offenders with twenty-five year sentences does not deter crime as much as it ruins lives … Discouraging recidivism by people who have already been in prison and been released serves a far more valuable purpose than deterring offenders who have yet to be arrested and have no knowledge of the law's penalties.

Ten years behind prison walls—what kind of man is Justin Bult?

"A person sentenced to life imprisonment is not eligible for parole by the board of pardons and paroles." SDCL 24–15–4. To prison authorities and fellow inmates, they are known as "lifers." If the resentencing judge follows the instructions of this Court, considers Bult's behavior over the last ten years, and conscientiously adheres to sentencing due process, petitioner could be eligible for parole, in the future, under SDCL 24–15–1.1 which provides in pertinent part:

> Parole is the discretionary conditional release of an inmate from actual penitentiary custody before the expiration of his term of imprisonment. The prisoner remains an inmate under the legal custody of the department of corrections until the expiration of his term of imprisonment. A prisoner is not required to accept a conditional parole. A prisoner is never entitled to parole. However, parole may be granted if in the judgment of the board of pardons and paroles granting a parole would be in the best interests of society and the prisoner.

It is obvious that a new sentence will be less than a life imprisonment, thus the above statute will eventually be considered. Bult was a first offender; Judge Martin, as exemplified by his remarks, determined, based upon outside reading, that Bult was an unrehabilitative individual and should be "written off" as incorrigible. There were no medical reports, criminal records, expert testimony, or evidence of any kind to substantiate that the decisional law of this state was followed and I particularly refer to *Weiker I*, *supra*. *Weiker I* cautioned against imposing a life sentence except in those type of cases where the defendant is without hope or a possibility of rehabilitation.

Both the Eighth Amendment of the United States Constitution and its comparable counterpart, Article VI, § 23 of this state's constitution, prohibit the infliction of cruel and unusual punishment. Was the sentence cruel considering the age of Bult, his background, the fact that he was a first offender, and the limited duration he held this little girl captive? In my opinion, it was. Though it becomes difficult to say, knowing he did a dastardly deed, one must consider that he did deliver the little girl back into the neighborhood and in approximately one-half hour. He did not kill her nor maim her nor use a weapon upon her, but he did traumatize her.

His actions have now cost him ten years of imprisonment. Does his sentence shock the "conscience and reason of men generally?" *See State v. Becker*, 3 S.D. 29, 40, 51 N.W. 1018, 1022 (1892) and *State v. Bad Heart Bull*, 257 N.W.2d 715, 720 (S.D.1977). As I

set forth in *State v. Holloway*, 482 N.W.2d 306, 319 (S.D.1992), wherein I dissented, this Court added this phrase "shock the conscience *of the Court*," as depicted in *State v. Antelope*, 304 N.W.2d 115, 117 (S.D.1981). *See also State v. Curtis*, 298 N.W.2d 807, 811 (S.D.1980). Therefore, we now appear to have two tests on conscience: Shock the conscience and reason of men generally and shock the conscience of the Court. The majority opinion holds it satisfies both scopes of review; with said holding, I agree. Thereafter, I part company with my Brothers that the proportionality review is "obviated" under *Harmelin*, cited in the majority opinion. It is not apposite to such a holding. Rather, because we have determined the sentencing to be shocking, the Eighth Amendment proportionality test is activated. Take heed of our recent pronouncement in *State v. Gehrke*, 491 N.W.2d 421, 423 (S.D.1992), and recognizing that the "conscience and reason of men generally," as well as the "conscience of this Court" is shocked.

> If a sentence is manifestly disproportionate to the crime, [in light of the gravity of the offense and harshness of the penalty] ... then the other two factors listed in *Helm* [sentence imposed on others in the same jurisdiction and in other jurisdictions] become more focused and require extensive review. *Weiker II*, 366 N.W.2d at 827. *See also Helm*, 463 U.S. at 292, 103 S.Ct. at 3011, 77 L.Ed.2d at 650.

In my opinion, this Court has reviewed the sentence of life imprisonment and has considered the punishment to be manifestly disproportionate to the crime. Therefore, at a new sentencing, so that a trial judge may focus on a fair sentence, a trial judge must consider sentences imposed on others who were given sentences for kidnapping and in other jurisdictions. It is termed, by writers, as "the within and without the jurisdiction proportionality test." *State v. Basker*, 468 N.W.2d 413, 418 (S.D.1991).

Petitioner's habeas counsel, challenging the constitutionality of his client's sentence, presented facts, statistics, data, records, and case sentencings in South Dakota. We have condemned a failure to present an adequate record so as the trial court could conduct a meaningful proportionality review. *State v. Castaneira*, 502 N.W.2d 112 (S.D.1993); *Holloway* at 311; *State v. Sheridan*, 383 N.W.2d 865 (S.D.1986); and *State v. Christians*, 381 N.W.2d 214 (S.D.1986). The habeas corpus court refused to consider other kidnapping sentences deeming all of the aforesaid data as "useless." In *Shilvock–Havird*, 472 N.W.2d 773, 779 (S.D.1991), cited in the majority opinion, Judge Erickson, writing for this Court (and who is the habeas court here) cited this writer's concurrence in result in *State v. Janssen*, 371 N.W.2d 353, 357 (S.D. 1985). Therein, he recognized that a proportionality test cannot be considered at appellate level unless it is raised at the trial court level. Certainly it can be said that a disproportional sentence can never be established unless counsel is permitted to establish his client's case by facts, statistics, data, records and case sentencings. Here, petitioner was totally denied a consideration which had a direct hearing on proportionality. Excessive or disproportionate sentences have been constitutionally offensive since 1892 in South Dakota. *Becker*, 51 N.W. 1018, 1022. A little word, "or," seems to be overlooked by many in this state; notice it cited below:

> On appeal, we first determine whether the sentence "shocks the conscience" *or* is so disproportionate to the crime that it *activates* the Eighth Amendment "within and without jurisdiction" proportionality tests. (Emphasis supplied mine.)

*State v. Lykken*, 484 N.W.2d 869, 879 (S.D. 1992). *Accord State v. Andrews*, 393 N.W.2d 76, 82 (S.D.1986); *State v. Weiker*, 366 N.W.2d 823, 827 (S.D.1985) (*Weiker II*). Obviate? No. Activate? Yes.

We need not follow *literally* all that is expressed in *Harmelin*. Need we adhere to the *strict proportionality principles* as held by the habeas court? No. A seminal case in this nation was *State v. Opperman*, 89 S.D. 25, 247 N.W.2d 673 (1976). Said decision, shining as a beacon for our sister states to follow a state's rights star, held that this very institution has the power to provide individuals with greater protection under the State Constitution than does the United States Su-

preme Court under the United States Constitution. *Accord: State v. Jones,* 406 N.W.2d 366, 369 (S.D.1987); *State v. McDowell,* 391 N.W.2d 661, 665 (S.D.1986); and *Daugaard v. Baltic Co-op Bldg. Supply Ass'n,* 349 N.W.2d 419 (S.D.1984).

If this Court failed to follow a strict proportionality rule under *Harmelin,* nevertheless a proportionality analysis would survive in this non-capital sentence case. *Harmelin* was a plurality decision. Justice Scalia, joined by Chief Justice Rehnquist, held that there was no proportionality guarantee attending the Eighth Amendment. Justices Kennedy, O'Connor and Souter joined forces holding that the Eighth Amendment encompasses a narrow proportionality principle in non-capital sentences. But Justices White, Blackmun, Stevens, and Marshall adhered to the broader proportionality principle in the *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983) holding. Therefore, seven Justices of the Supreme Court of the United States adhere to the proportionality standard which may be raised under the Eighth Amendment. Justice Kennedy wrote: "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin,* — U.S. at ——, 111 S.Ct. at 2705, 115 L.Ed.2d at 866–874 (citing *Solem,* 463 U.S. at 288, 303, 103 S.Ct. at 3008, 3016). Instanter, the majority opinion holds the Bult sentence is shocking to the conscience of men generally and to the conscience of this Court. We are thus decreeing that the sentence is grossly disproportionate to the crime and the *Harmelin* decision supports a decision to implement the *Solem* test.

Replete is the record below with exhibits, case history, statistics, and data setting forth twenty defendants who were sentenced to the State Penitentiary in South Dakota for kidnapping. It is abundantly clear that Bult has been treated far more harshly than these prisoners. Twelve are serving a specific term of years, from 25 years to 51 years. Every one of these sentences stemmed from far more aggravated facts than the one under consideration, including a history of serious crime, which cannot be demonstrated against Bult. Of eight individuals serving life sentences for kidnapping, only one involves a mandatory sentence of life imprisonment. In the latter case, the prisoner was found guilty of murder as well as kidnapping.

In *Solem v. Helm,* a case arising in South Dakota, Justice Brennan expressed: "The principle that a punishment should be proportionate to the crime is deeply rooted and frequently repeated in common-law jurisprudence." 463 U.S. at 284, 103 S.Ct. at 3006. Later, we were reminded by the writer that the constitutional principle of proportionality has been explicitly recognized for almost a century.

I despise the acts of Bult; however, he is entitled to a meaningful hearing. I remind you of Chief Justice Burger's written words which I referenced in *Gehrke* at 427:

In part the terrible price we are paying in crime is because we have tended—once the drama of the trial is over—to regard all criminals as human rubbish. It would make more sense, from a coldly logical viewpoint, to put all "rubbish" into a vast incinerator than simply store it in warehouses for a period of time, only to have most of the subjects come out of prison and to return to their old ways. Some of this must be due to our failure to try—in a really significant way—to change these men while they are confined. We lawyers and judges sometimes tend to fall in love with procedures and techniques and formalism. The imbalance in our system of criminal justice must be corrected so that we give at least as much attention to the defendant after he is found guilty as before. We must examine into the causes and consequences of the protracted warfare our system of justice fosters. Whether we find it palatable or not, we must proceed, even in the face of bitter contrary experiences, in the belief that every human being has a spark somewhere hidden in him that will make it possible for redemp-

tion and rehabilitation. If we accept the idea that each human, however "bad," is a child of God, we must look for that spark.

Life is a burning candle. It is a dear light—a light—so precious—prison walls should not extinguish lest it ebb away into a state of total darkness. Bult. Does he possess the spark?